UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Marcelino Segura Palmer, Mexico, | ) ) ) |
| Petitioner, | ) ) Case No. 1:23-cv-00235 |
| v. | ) ) ) |
| Gabriela Rodriguez Gradilla, | ) ) |
| Respondent. | ) ) ) |

**PETITION FOR RETURN OF MINOR CHILD TO MEXICO
AND ISSUANCE OF SHOW CAUSE ORDER**

Pursuant to The Convention on the Civil Aspects of International Child Abduction, Done at The Hague on Oct. 25, 1980 and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, et seq.

Petitioner MARCELINO SEGURA PALMER ("Mr. Segura," "Petitioner," or "Father"), through his undersigned *pro bono* counsel, brings this Petition against Respondent GABRIELA RODRIGUEZ GRADILLA ("Respondent" or "Mother"), seeking the expedited return to Mexico of their minor daughter C.L.S.R. ("C.L.S.R." or "the Child").[1]

C.L.S.R. was born in 2015 and spent her life in Mexico with both of her parents, except for a six-month period during which Respondent left for the United States without C.L.S.R., leaving the Child in Mexico with her Father. Mr. Segura has never consented for C.L.S.R. to live anywhere other than Mexico, and he was exercising his parental rights until the time of C.L.S.R.'s

---

[1] In compliance with Federal Rule of Civil Procedure 5.2(a), only the initials of the Child are included in this Petition and only her year of birth is disclosed. Her name, month and date of birth have been redacted from all exhibits to be entered in any public records. Unredacted documents will be provided to the Court *in camera*.

1

wrongful removal to the United States. Indeed, Mr. Segura has been actively looking for his daughter since Respondent absconded to the United States and has begged for her return at every opportunity.

As more fully described herein, in 2021, Mr. Segura agreed for C.L.S.R. and Respondent to go on what he understood was a simple trip to visit Respondent's maternal grandmother in a nearby town in Mexico. He only learned after they left that the trip was a charade and Respondent had actually absconded with the child to Cincinnati, Ohio to live with a man she had secretly married while she was previously in the United States. Respondent allowed very limited communication between Mr. Segura and the Child shortly after arriving in the United States, and cut off communication completely once Respondent learned in or around July 2021 that Mr. Segura filed an application with the Mexican Central Authority for the Child's return pursuant to the Hague Convention. In sum, Respondent wrongfully removed C.L.S.R. from Mexico within the meaning of the Hague Convention.

Although more than a year has passed since C.L.S.R was brought into the United States, the unfortunate record of C.L.S.R.'s life in the United States reflects that she is plainly not well-settled. Since being taken from Mexico, she has had a traumatic childhood marked with multiple moves (some planned, some emergent, some covert), repeated exposure to domestic violence, physical injury resulting from domestic violence, state proceedings to terminate her mother's parental rights, and repeated and on-going exposure to her mother's husband who has a history drug abuse and physical violence and has been accused of sexually abusing his own daughter. The State of Ohio initiated proceedings to remove C.L.S.R. from her mother's custody, and she is currently subject to protective orders which aim to protect her health and safety from the abusive home environment. Because C.L.S.R. was impermissibly removed from her habitual residence in

Mexico and brought to the United States, in breach of her Father's parental rights, and because C.L.S.R. is not well-settled in the United States and is, instead, living in unstable and unsafe conditions, the Hague Convention mandates an order directing C.L.S.R.'s immediate return to Mr. Segura in Mexico.

**I.         Introduction and the Hague Convention.**

1. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on Oct. 25, 1980 ("the Hague Convention" or "the Convention"), a copy of which is attached hereto as Exhibit A, and the International Child Abduction Remedies Act ("ICARA" or "the Act"). The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States and Mexico on Oct. 1, 1991.

2. The objects of the Convention are as follows: "(1) to secure the prompt return of children wrongfully removed or retained in any Contracting States; and (2) to ensure that rights of custody and access under the law of one Contracting State are effectively respected in other Contracting States." Convention, Art. 1. Pursuant to Article 11 of the Convention, "judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children."

3. Under the Convention and the Act, "courts are to determine whether the child has been wrongfully removed from his place of habitual residence and are not to determine custody." *Cunningham v. Quinn,* No. 22-1279, 2022 U.S. App. LEXIS 30861, at *5 (6th Cir. Nov. 7, 2022) *see also Douglas v. Douglas*, No. 21-1335, 2021 U.S. App. LEXIS 28909, at *10 (6th Cir. Sep. 21, 2021) ("[A] court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute"). "The Convention's mission is basic:

to return children to the State of their habitual residence, to require any custody disputes to be resolved in that country, and to discourage parents from taking matters into their own hands by abducting a child." *Taglieri v. Monasky,* 907 F.3d 404, 407 (6th Cir. 2018) (quotations omitted).

4. The Convention applies to cases in which one parent wrongfully removes and retains his or her child, who is under the age of sixteen (16) years, from the child's "habitual residence" in breach of the other parent's custodial rights, which were being exercised at the time of the wrongful retention of the child. Hague Convention, Art. 3.

5. This Court is directed to return C.L.S.R. to Mexico because, under the Convention and the Act, a preponderance of the evidence establishes that: (1) Mexico was the Child's habitual residence since her birth; (2) Mr. Segura was exercising his Mexican custody rights at the time Respondent removed the Child from Mexico; (3) none of the narrow exceptions to mandatory return under the Convention applies to this case; and (4) C.L.S.R. is not well-settled in the United States. Simply put, Mexico—not the United States—is the country that should make any custody determinations regarding the care and guardianship of C.L.S.R.

**II.     Jurisdiction and Venue**

6. This Court has jurisdiction pursuant to 42 U.S.C. § 11603, which provides concurrent jurisdiction to state and federal courts, because this case involves the removal and retention of a child under the age of sixteen from her habitual residence in Mexico to the United States.

7. Venue is proper in this Court because Mr. Segura understands Respondent and the child to be located in Cincinnati, Ohio, and the State of Ohio has initiated proceedings in this district to terminate the parental rights of Respondent.

**III.    Return of a Wrongfully Removed Child Under the Hague Convention**

8. Pursuant to Article 12 of the Convention, "[w]here a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith."

9. Article 12 also provides that, when proceedings brought pursuant to the Convention are not commenced within one year of the wrongful removal, the Contracting State "shall also order the return of the child" when the child is not "well settled."

10. Article 13 of the Convention provides three additional defenses, none of which is applicable here. The first is that the return of the child need not be ordered when the petitioning parent was either not exercising custodial rights at the time of the removal, or had consented to the removal. As discussed *infra*, Mr. Segura was exercising custodial and parental rights at the time C.L.S.R. was removed from Mexico, and the removal occurred notwithstanding Mr. Segura's continued objection and request for C.L.S.R. to be returned to Mexico. Indeed, C.L.S.R. was only removed from Mr. Segura's supervision as a result of Respondent's deceit.

11. The second defense is only applicable where "return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." As discussed *infra*, C.L.S.R. has been in distress over *not* being able to return to her father, was surrounded by caring family in Mexico, and is in fact in danger in the United States. This defense is likewise inapplicable.

12. Lastly, the Court may refuse to return a child to their country of habitual residence where the child "has attained an age and degree of maturity" at which the child could competently object to being returned, and does in fact so object. As discussed *infra*, in addition to C.L.S.R.

5

being too young to satisfy this discretionary defense, C.L.S.R. has longed for reunion with her father in Mexico.

**IV.     Status of Parties and Background Information**

    **A.     Mr. Segura has Parental Rights Regarding C.L.S.R.**

13.     In Mexico, custodial rights are conferred by a parent being named on the birth certificate. *See, e.g.,* Jalisco State Civil Code, Title VI, Chapter III, Article 500 (*Titulo Sexto—De la paternidad y filiación, Capitulo III—De la filiación, Articulo 500*), providing the following methods of recognizing paternity outside of marriage: on the birth certificate; in a special record before the Civil Registry Officer; in a public writing; in a will; or by direct and express declaration in a judicial proceeding; *see also* Federal Civil Code of Mexico, Title 7, Chapter 4, Article 369 (*Código Civil Federal, Titulo Septimo, Capitulo IV, Artículo 369*), providing the same. Mr. Segura is named as the father of C.L.S.R. on her birth certificate. Thus, Mr. Segura has all the same rights and responsibilities for C.L.S.R. regardless of whether he is biologically her father or not, and the question of genetic paternity is not material to the disposition of this Petition.[2]

14.     At all times since C.L.S.R.'s birth until the time Respondent absconded to the United States, Mr. Segura was exercising his paternal custody rights, first jointly with Respondent and then individually when Respondent went to the United States and left C.L.S.R. and Mr. Segura together in Mexico for six months in or around 2020.

    **B.     C.L.S.R.'s Habitual Residence is in Mexico.**

---

[2] Respondent filed an action *in Mexico* challenging Mr. Segura's paternity. However, this is not relevant to the current dispute under Mexican law, as Mr. Segura appears on C.L.S.R.'s birth certificate. Indeed, Respondent's filing of that motion is a concession that Mexico is the correct jurisdiction to resolve any custody disputes related to C.L.S.R., thus supporting C.L.S.R.'s return to Mexico.

15. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence . . . A child's residence in a particular country can only be considered 'habitual' when 'her residence there is more than transitory' . . . What makes a child's residence 'habitual' is . . . 'some degree of integration by the child in a social and family environment.'" *Douglas v. Douglas*, No. 21-1335, 2021 U.S. App. LEXIS 28909, at *10-11 (6th Cir. Sep. 21, 2021) *citing Monasky v. Taglieri,* 140 S. Ct. 719, 726 (2020) (affirming grant of petition to return child to country of habitual residence).

16. C.L.S.R. was born in San Francisco de Campeche, Campeche, Mexico, in 2015. The parents were not married at the time of her birth (and have never been married), but both are listed on her birth certificate: Marcelino Ramon Segura Palmer (aged 31, nationality Mexican) and Gabriela Rodriquez Gradilla (aged 20, nationality Mexican). C.L.S.R.'s birth certificate is attached hereto as Exhibit B.

17. For the duration of C.L.S.R.'s life, she resided only in Mexico with both her Father and Respondent at their family home in Guadalajara, Jalisco, Mexico. C.L.S.R. never moved from Mexico, until the wrongful abduction described herein. C.L.S.R. was thus "at home" in Mexico, and her presence there was in no way "transitory."

18. Similarly, C.L.S.R. attended school in Mexico, at Estancia Infantil – El Pequeno Mundo de Pingui. She was close to her paternal family. C.L.S.R. partook in all of the normal activities that a child would enjoy in her country of habitual residence. C.L.S.R. was thus "integrated" into her "social and family environment" in Mexico.

19. All facts require the conclusion that C.L.S.R.'s habitual residence is in Mexico.

**C.    C.L.S.R. was Wrongfully Removed from Mexico.**

20. A removal or retention of a child is wrongful under Article 3 of the Hague Convention if: (a) the removal of retention is in breach of custody rights attributed to a person, institution, or other body, either jointly or alone, under the law of the state in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention, those custody rights were actually exercised, or would have been exercised, but for the removal or retention of the child. See Hague Convention, Arts. 3 and 5.

21. "Custody rights" under the Hague Convention are defined to include "rights relating to the care of the person of the child, and in particular, the right to determine the child's place of residence." See Hague Convention, Art. 5(a).

22. As discussed *supra*, C.L.S.R. habitually resided in Mexico, Mr. Segura has paternal rights under Mexican law and was exercising those rights at the time Respondent abducted C.L.S.R.

23. In or about February 2020, Respondent told Mr. Segura that she wanted to go visit her mother in the United States for a few months and to take C.L.S.R. with her. Respondent and Mr. Segura discussed and agreed on a plan for Respondent and C.L.S.R. to visit Respondent's mother in Nashville and to return to Mexico as soon as their tourist visas expired. Based on that agreement, Respondent and Mr. Segura began the steps for processing Mexican passport paperwork for C.L.S.R. to be able to travel with her mother. However, when the Covid-19 pandemic hit, they abandoned the paperwork and any plans for C.L.S.R. to travel to the United States. Instead, Respondent traveled to the United States alone in July 2020, leaving C.L.S.R. with Mr. Segura at their family home.

24. Mr. Segura exercised sole custody and took care of all needs for C.L.S.R. while Respondent was in the United States. He learned from Respondent that her mother had helped her

secure false identification with the name Dorca Perez so that she could work in the United States for a company called ABM Building Value Commercial Janitorial Cleaning Services as a cleaning clerk. Respondent returned to their family home in Mexico in January 2021, and they resumed their normal life as a family.

25. In or around March 2021, Respondent brought up the idea that she would like to go visit her maternal grandmother for a couple of weeks in a nearby town in Jalisco, Mexico called Talpa de Allende. They made a plan for Respondent to travel with C.L.S.R. to the grandmother's house for two weeks and then return to their home in Guadalajara to begin some work projects. Respondent and C.L.S.R. left home on March 7, 2021, at approximately 9:00 am for Talpa de Allende.

26. For three days, Respondent only contacted Mr. Segura by text message with updates about the trip and that they might be held up for a few extra days. And then, on March 11, 2021, Respondent called Mr. Segura, apologized for what she was about to tell him, and informed him that the whole visit to Talpa de Allende had been a lie and she was actually in Cincinnati, Ohio, though she would not give him an exact location. She told him that she had married an American named Chris Moss on her last visit to the United States to obtain legal residency, and now that she had entered the United States, neither she nor C.L.S.R. would be returning to Mexico. She told him the only way he could ever see his daughter again was to come to the United States, and that if he initiated legal proceedings in the United States or Mexico, she would not let him see his daughter ever again. Respondent told him that if he initiated any challenges to their immigration proceedings, she would tell C.L.S.R. that he had died in a car accident to erase him from C.L.S.R.'s mind.

D. **C.L.S.R. is Not Well-Settled in the United States.**

27. To show that a child is well-settled, and thus should not be returned to their country of habitual residence, the evidence must show that the child is "in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects . . . There must be substantial evidence of the child's significant connections." *Anderson v. Acree*, 250 F. Supp. 2d 876, 880 (S.D. Ohio 2002) (quotations omitted).

28. In March 2021, Respondent allowed Mr. Segura to have video calls with his daughter for about four days, and then on two subsequent Sundays for 10 minutes each time. During those phone calls, C.L.S.R. told Mr. Segura that her mother hits her every time she asks for him or tries to talk to him, that the man they were living with is very strict and mean, that her mother told her that man will be her father now, and that if someone asks her who her father is, she is not to say Mr. Segura's name. C.L.S.R. appeared scared and distraught to Mr. Segura and was visibly crying and asking to go back to her home in Guadalajara.

29. Mr. Segura filed an application with the Mexican Central Authority for the return of C.L.S.R. to Mexico pursuant to the Hague Convention on April 19, 2021 – just weeks after learning of the abduction. Upon receiving the application, the United States Department of State – Office of Children's Issues, in its capacity as the United States Central Authority, sent a voluntary return letter on July 6, 2021, to Respondent at an address that the State Department identified. Since that time, Respondent has cut off all communication with Mr. Segura and he has had no ability to speak with his daughter at all.

30. From time to time, Mr. Segura received messages from an individual identified as Chris Moss, who Mr. Segura understood to be Respondent's husband. The messages indicated that he and Respondent had marriage problems and she had left him, taking C.L.S.R. and a new baby believed to be Mr. Moss's child. Mr. Moss did not know where they went, and conveyed to Mr.

Segura that C.L.S.R. missed him very much and offered to help get them in contact. However, the communications ended abruptly and Mr. Moss never did connect Mr. Segura to his daughter.

31. On or about July 18, 2022, Respondent called Mr. Segura late at night in a state of hysteria. Respondent kept apologizing to Mr. Segura, but would not articulate what she was apologizing for. She stated that he had always been a good dad to C.L.S.R. and that C.L.S.R. needed him, but she would not confirm that C.L.S.R. was ok, tell him where she was, or let him talk with his daughter, though she said she would let him talk to her sometime soon. Respondent never did allow Mr. Segura to speak to C.L.S.R. Mr. Segura recorded the call because he was so concerned about what Respondent was saying and concerned about her affect and mental health (including how C.L.S.R.'s safety might be jeopardized).

32. Mr. Segura messaged Respondent repeatedly, asking to speak with his daughter each time. Respondent refused to allow the communication, and then cut off contact again completely. After the July 18 call and the subsequent messages when it became clear Respondent was not going to permit Mr. Segura to speak with C.L.S.R., Mr. Segura became very concerned about the life and safety of his daughter.

33. In response, Mr. Segura's counsel began requesting welfare checks from the Hamilton County Sheriff's Office in an attempt to locate C.L.S.R. and confirm her whereabouts at any of the potential addresses that they could identify. Counsel obtained permission from the State Department to seek a welfare check at an address that they had located. C.L.S.R. was not at any of those locations. However, in response to the last address, police officers confirmed that they were familiar with Respondent, as she had been involved in a domestic violence incident which spanned several days in October 2022. The police officer did not believe that the male involved at the home at that time was named Chris Moss. The police officer confirmed that C.L.S.R. was alive at the

11

time of the domestic violence incident, and that Respondent had told them she was going to stay with her mother for one night and then find a new place to live, but the officer could not provide a current address for Respondent or C.L.S.R.

34. This was all the information that Mr. Segura had about C.L.S.R. until approximately five weeks ago when Guardian Ad Litem Brady Vonderembse contacted Mr. Segura's counsel to inquire about her relationship to C.L.S.R. because he had seen counsel's name in police records from the welfare check attempts. Mr. Vonderembse conveyed to Mr. Segura's counsel that the State had initiated proceedings to terminate Respondent's parental rights, and in that process, Respondent had reported that C.L.S.R. did not have an involved father. Counsel notes that C.L.S.R.'s last name was spelled wrong in proceedings (starting with a C rather than an S), making it more difficult for anyone to connect C.L.S.R. to Mr. Segura. Although Respondent has always had a way to contact Mr. Segura, he was never informed of any of the state's proceedings; it was only after Mr. Vonderembse's email that Mr. Segura learned of the state's proceedings against Respondent with respect to C.L.S.R.

35. In an emergency hearing held April 25, 2023, Mr. Segura and the undersigned counsel learned for the first time the full extent of C.L.S.R.'s tragic circumstances since she has been living in the United States. The individual who has been identified to Mr. Segura as "Chris Moss" is actually named Christopher Reed. Mr. Reed and Respondent have a long history of domestic violence, with both of them acting as the aggressor in reports of various incidents. Respondent reported being punched in the face and bloodied by Mr. Reed while holding her new baby. Respondent reported (but possibly later recanted) an incident in which Mr. Reed pressured her into taking drugs, abandoned her in a parking lot when she refused leaving her to walk home alone at which time she alleges she was attacked and raped by a neighbor who still lives in their

12

apartment building, and then taunted Respondent over the alleged rape so often that Respondent grabbed a knife with the intent to kill the alleged rapist and instead injured herself. Respondent had a psychotic episode that resulted in her being hospitalized, during which time Respondent's mother watched the children but was too fearful of Mr. Reed to take the children to a shelter or secure location. C.L.S.R. was interviewed by Hamilton County Job & Family Services and reported witnessing the acts of domestic violence, observing the family bathroom covered in blood, and at least one incident in which she was caught in the cross-fire of a lit candle that Respondent threw at Mr. Reed, which resulted in C.L.S.R. being burned by the wax.

36. Hamilton County Job & Family Services also interviewed Mr. Reed's sister who conveyed that Mr. Reed has been heavily involved in the drug trade in the past and may be at odds with members of a drug cartel in Colorado. She also reported that he has an older daughter (now aged 30) who Mr. Reed was accused of threatening to kill when the child was six years old. The sister reported that, when the child turned 18, she stated that Mr. Reed had been sexually abusing her from the time she was a young child.

37. When Family Services put C.L.S.R. under protective orders, Mr. Reed left the state and was not in physical proximity to C.L.S.R. for the past three months. However, Mr. Reed recently returned to Ohio and is living with Respondent's mother. Although the state court has not agreed for Mr. Reed and Respondent to cohabitate, Reed once again has access to Respondent, their minor child, and C.L.S.R., although Respondent is supposed to supervise any visitation with C.L.S.R. Mr. Reed has agreed to partake in a YWCA "Transform" program, but has not done so yet. The results of his latest psychological evaluation have not been returned yet.

38. In the emergency hearing, Mr. Segura also learned that Mr. Reed conveyed a concern to Family Services that Respondent would take their child and disappear because she had admitted to him that she had done that before to C.L.S.R.'s father in Mexico.

39. Because the child's health and safety have been at risk, Mr. Segura attended the emergency hearing and sought immediate access to his daughter, which the magistrate ordered, thus allowing Mr. Segura to see his daughter for the first time in nearly two years. Mr. Segura did not, and does not, consent to the state court making a custody determination of C.L.S.R. because that must be appropriately resolved in the country of C.L.S.R.'s habitual residence, Mexico. Mr. Segura has notified the state court of his intention to pursue the return of C.L.S.R. through the Hague Convention and has sought a stay of any proceedings which would establish custody rights as to C.L.S.R. until this Court resolves his petition for return.

40. C.L.S.R. has moved frequently since the wrongful removal, has had to rely on others for shelter, and has lived in dangerous situations with dangerous individuals, to the extent that Family Services has had to intervene to protect C.L.S.R. It is clear that C.L.S.R. is not settled at all, let alone well-settled, in the United States.

**V.     Declaration Pursuant to Uniform Child Custody Jurisdiction and Enforcement Act**

41. The details regarding C.L.S.R. that are required to be provided under the UCCJEA are as follows:

   a. The present address of the child is in Cincinnati, Ohio.

   b. Prior to her retention, C.L.S.R. lived in Mexico for her entire life, approximately five years.

   c. Mr. Segura is aware that the State of Ohio initiated proceedings to remove C.L.S.R. from her mother's custody, and the child is currently in the custody of her mother

14

      subject to protective orders regarding her safety and whereabouts. Mr. Segura is also aware that Respondent initiated proceedings in Mexico related to the custody of C.L.S.R. before she absconded, but the Mexican proceedings are stayed until the child returns to the country.

    d. Mr. Segura does not know of any person or institution not a party to these proceedings who has physical custody of the child or claims to have rights or parental responsibilities, legal or physical custody of, or visitation or parenting time with the Child.

## VI. Notice of Hearing

42. Pursuant to 42 U.S.C. §11603, Respondent will be given notice of any hearing in accordance with Section 3127.19, Ohio Revised Code, governing notice and opportunity to be heard.

## VII. Attorneys' Fees and Costs Pursuant to Convention Article 26 and 42 U.S.C. § 11607

43. Mr. Segura will incur substantial expenses as a result of the wrongful removal of C.L.S.R. Mr. Segura will submit a copy of the total expenditures as soon as practicable and may amend those costs from time to time, according to proof and in light of further expenditures required because of this wrongful removal.

### Relief Requested

WHEREFORE, Marcelino Segura Palmer respectfully requests the following relief:

1. That this Court issue an Order directing the prompt return of C.L.S.R. to Mexico in accordance with Petitioner's rights of custody under the laws of Mexico;

2. That this Court issue an Order prohibiting the removal of C.L.S.R. from this jurisdiction and taking into safe-keeping the Respondent's and child's passports and travel documents during the pendency of this case;

3. That this Court issue an Order directing the Respondent to pay Petitioner's reasonable legal fees, costs and expenses; and

4. That this Court grant any such relief as justice and the Petitioner's cause may warrant.

Respectfully submitted on this 26th day of April, 2023,

/s/ Chandra Napora
Chandra Napora (Ohio Bar. No. 0092886)
Jonathan Lischak (Ohio Bar. No. 0097669)
Jillian Estes (Fla. Bar No. 0055774)
MORGAN VERKAMP, LLC
4410 Carver Woods Drive, Suite 200
Cincinnati, OH 45242
Tel: (513) 651-4400
chandra.napora@morganverkamp.com
jonathan.lischak@morganverkamp.com
jillian.estes@morganverkamp.com

Elizabeth Powers
ELIZABETH POWERS LAW
1053 St. Gregory St.
Cincinnati, OH 45202
(513) 338-5678
attorney@elizabethpowerslaw.com

*Counsel for Petitioner Marcelino Segura*